UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WILLIAM STONER, Individually and on Behalf of All Others Similarly Situated, | § § § § § | |
| Plaintiff, | § § | Civil Action No. 4:17-cv-3317 |
| v. | § § | JURY TRIAL DEMAND |
| CALPINE CORPORATION, JOHN B. (THAD) HILL III, MARY L. BRLAS, FRANK CASSIDY, MICHAEL W. HOFMANN, JACK A. FUSCO, DAVID C. MERRITT, W. BENJAMIN MORELAND, ROBERT A. MOSBACHER, JR., DENISE M. O'LEARY, and ENERGY CAPITAL PARTNERS III, LLC, | § § § § § § § § § § | |
| Defendants. | § § | |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND
20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff William Stoner ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief, including investigation of counsel and review of publicly available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

**NATURE OF THE ACTION**

1.     Plaintiff brings this class action on behalf of the public stockholders of Calpine Corporation ("Calpine" or the "Company") against Calpine's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, arising out of the Board's attempt to sell the Company to Energy Capital Partners III, LLC

("ECP") and a consortium of investors that includes Access Industries, Inc. and the Canada Pension Plan Investment Board.

2.      Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading preliminary proxy statement (the "Proxy") to be filed with the Securities and Exchange Commission ("SEC") on October 19, 2017.  The Proxy recommends that Calpine shareholders vote in favor of a proposed transaction (the "Proposed Transaction") whereby Calpine is acquired by private equity investment firm Energy Capital Partners.  The Proposed Transaction was first disclosed on August 18, 2017, when Calpine and ECP announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which ECP will acquire all of the outstanding shares of common stock of Calpine for $15.25 per share (the "Merger Consideration").  The deal is valued at approximately $5.6 billion and is expected to close in the first quarter of 2018.

3.      For decades, academic research has discussed the tendency of managers to focus on short-term gains over more value-creating, but longer-term, prospects.[1]  An increase in stock price, for example, may be one such short-term gain.  Yet attempts to increase stock price may backfire; one study found that when CEOs focus on short-term stock price, they tend to act in ways that actually reduce value.[2]  Stock price is not always indicative of value.

4.      Calpine's stock price has creeped lower over the past two years, of no fault of its own.  The Company is doing well, with impressive cash flows and stable growth prospects. Being an energy producer, Calpine is situated at the crossroads of the renewable energy boom

---

[1]  He, Zhaozhao and David Hirshleifer, "Managerial Scientific Expertise, Innovation, and Firm Performance," September 2017, at 1, *available at* http://www.fmaconferences.org/Boston/PhD_CEO_Innovation_and_Firm_Performance_FMA.pdf.

[2]  Edmans, Alex, Vivian W. Fang and Allen H. Huang, "The Long-Term Consequences of Short-Term Incentives," European Corporate Governance Institute, Finance Working Paper No. 527/2017, September 2017.

and fossil fuel dependency, able to provide energy through natural gas when solar and wind cannot meet demand.  There are even opportunities for Calpine to increase its portfolio of renewable energy power plants.  Yet, the Board's myopic focus on the stock price has led it to sell the Company and insulate it from the demands of the market.

5.      Even if the Proposed Transaction was the best way to maximize shareholder value, the Merger Consideration is inadequate given the Company's prospects.  Furthermore, the Proxy is materially incomplete and contains misleading representations and information in violation of Sections 14(a) and 20(a) of the Exchange Act.  Specifically, the Proxy contains materially incomplete and misleading information concerning the sales process, financial projections prepared by Calpine management, as well as the financial analyses conducted by Lazard Frères & Co. LLC ("Lazard"), Calpine's financial advisor.

6.      For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including filing a definitive proxy statement ("Definitive Proxy") with the SEC or otherwise causing a Definitive Proxy to be disseminated to Calpine's shareholders, unless and until the material information discussed below is included in the Definitive Proxy or otherwise disseminated to Calpine's shareholders.  In the event that the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from Defendants' violations.

## PARTIES

7.      Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Calpine.

8.      Defendant Calpine is a corporation organized and existing under the laws of the State of Delaware.  The Company's principal corporate offices are located at 717 Texas Avenue, Suite 1000, Houston, Texas, 77002.  Calpine common stock trades on NYSE under the ticker symbol "CPN."  The Company generates electricity at their 80 power plants primarily located in the United States.

9.      Defendant John  (Thad) B. Hill III is the President and CEO of Calpine.  He has been President, CEO and a director of the Company since May 2014.

10.      Defendant Mary L. Brlas has been a director of the Company since August 2016.

11.      Defendant Frank Cassidy has been Chairman of the Board since May 2016 and has been a director of the Company since January 2008.  Cassidy served as lead independent director of the Board from May 2014 until May 2016.

12.      Defendant Jack A. Fusco has been a director of the Company since August 2008.

13.      Defendant Michael W. Hofmann has been a director of the Company since May 2013.

14.      Defendant David C. Merritt has been a director of the Company since February 2006.

15.      Defendant W. Benjamin Moreland has been a director of the Company since January 2008.

16.      Defendant Robert A. Mosbacher, Jr. has been a director of the Company since February 2009.

17.      Defendant Denise M. O'Leary has been a director of the Company since January 2008.

18.     Defendants Hill, Brlas, Cassidy, Fusco, Hofmann, Merritt, Moreland, Mosbacher, and O'Leary are collectively referred to herein as the "Board."

19.     Defendant ECP is a private equity firm with offices in New Jersey, Texas, and California.  ECP primarily invests in energy infrastructure in North America.

### JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

21.     Personal jurisdiction exists over each Defendant either because each Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Calpine maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of Calpine common stock and their successors in interest and/or their transferees, except

Defendants and any person, firm, trust, corporation or other entity related to or affiliated with Defendants (the "Class").

24.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all members is impracticable. As of August 17, 2017, Calpine had approximately 360.6 million shares outstanding.

(b)    Questions of law and fact are common to the Class, including, inter alia, the following:

(i)    Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(ii)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

(iii)    Whether Plaintiff and other members of the Class would suffer irreparable injury were Defendants to file a Definitive Proxy with the SEC that does not contain the material information referenced above and the Proposed Transaction is consummated as presently anticipated;

(iv)    Whether the Individual Defendants breached their fiduciary duties of undivided loyalty, independence, or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(v)    Whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the

circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(vi)    Whether the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and the other members of the Class;

(vii)    Whether the Individual Defendants breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, honesty and fair dealing;

(viii)    Whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives, including offers from interested parties for the Company or its assets;

(ix)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transaction complained of herein consummated; and

(x)    Whether the Class is entitled to injunctive relief or damages as a result of the Individual Defendants' wrongful conduct.

(c)    Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)    Plaintiff's claims are typical of those of the other members of the Class.

(e)    Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.     Company Background

25.     Calpine is one of the largest producers of electricity in the United States, primarily using natural gas-fired combustion turbines and geothermal steam turbines.  There is one oil-fired steam-based plant and one photovoltaic solar plant in the Company's portfolio.  The Company has a large presence in California, Texas, the Northeast, and the Mid-Atlantic region, with its geothermal assets in California the largest geothermal power generation portfolio in the United States.  Over the past two years, Calpine has expanded into retail sale of electricity through the acquisitions of Champion Energy in 2015, Calpine Solutions in 2016, and North American Power in 2017.

26.     The Company's strategy is to deliver long-term shareholder value, and it focuses on two areas to accomplish this: capital allocation and operational excellence.  Calpine's capital allocation strategy focuses on strengthening its balance sheet, paying down debt and stock

buybacks. The Company measures operational excellence through, among other things, expanding customer sales channels, optimizing its portfolio and engaging in advocacy efforts.

27. Despite Calpine's objective of delivering long-term shareholder value, its efforts and actions demonstrate that those responsible for oversight and management focused instead on an increase in the Company's stock price. For example, the Proxy states that the Board, in an effort to maximize shareholder value, has considered transactions including stock buybacks, dividends, acquisitions, divestitures or business combinations.

28. It is understandable that the Board is concerned about the Company's stock price. According to an article published with SeekingAlpha on October 14, 2015, entitled "Calpine Corp: Activist Management, Eco-Friendly And Significantly Undervalued," despite the Company's best efforts, the stock price began to decline after reaching more than $24.00 per share in 2014. "The stock is trading at 2011 levels despite (1) much fewer outstanding shares and (2) Adjusted free cash flow per share rising from $1.01 (2011) to over $2.20 per share (2015 full year estimate)[,]" the article noted. The declining stock price, according to the article, might have been due to the fickle fealty of investors:

> Calpine does not pay a dividend. Management has been using excess cash flows to delever and buy back stock instead. For the time being, this limits the scope of investors to those interested in utilities but not for the dividend yield. Logic suggests this eliminates a lot of potential individual investors which is confirmed by Calpine's 95% institutional ownership. . . . I expect the payment of a well covered dividend of almost any amount will result in bullish price action.

This implies that Calpine's undervalued stock price is dependent on investors seeking to take cash from the Company in the form of a dividend. Until the Company does that, the stock would stay depressed.

29. Calpine's stock price continued to decline in 2015, according to a December 16, 2015 article on SeekingAlpha entitled "Is The Calpine Dip An Opportunity?", because the

market was seeing a sell-off of natural gas related stocks.  "Anything natural gas-related is being sold, regardless of the underlying fundamentals[,]" the article stated.  "The continued drop in oil and gas prices dictates that electricity will remain low.  Calpine is still able to generate excess free cash in a low electricity price environment; however, it gets better margins on high prices." The bottom-line: Calpine "is being unduly punished by the decline in oil and gas prices."

30.    There are a number of strategies the Board could have taken that, while perhaps not increasing the stock price, would have increased the value of the firm.  For example, Calpine currently has just one photovoltaic solar power plant.  While the International Energy Agency projected that the growth of solar energy would eventually decline, the actual added capacity of solar energy had increased exponentially over the last few years.  Auke Hoekstra, the head researcher at the Technical University of Eindhoven in The Netherlands, created a chart[3] to compare actual added capacity of solar energy against annual predictions by the International Energy Agency:

---

[3]  https://twitter.com/AukeHoekstra/status/866313289306963969/photo/1?ref_src=twsrc%5Etfw&ref_url=http%3A%2F%2Fwww.businessinsider.com%2Fsolar-power-chart-projections-2017-6.



31.     The exponential rise of solar energy capacity over the past 15 years portends continued growth.  In fact, in 2016, both the United States and China almost doubled the number of photovoltaic solar panels installed in those countries in 2015.  And the cost to install photovoltaic solar panels continues to decrease, with a 67% drop in price from 2011 to 2016.  As a June 6, 2017 Business Insider article entitled "One chart shows how solar energy growth is skyrocketing compared to predictions" stated: "[i]f the price of solar continues to decline, adoption of the renewable energy source will likely become even more common . . . ."[4]

---

[4]  http://www.businessinsider.com/solar-power-chart-projections-2017-6.

32.    A similar phenomenon can be seen in California.    According to California Distributed Generation Statistics, solar energy capacity as captured by net metering was less than 500 megawatt hours in 2007, compared to more than 5,000 megawatt hours in 2017:



33.    According to a PRI report from July 20, 2017, California has produced so much energy from renewable energy sources that it has paid neighboring states to take excess renewable energy to avoid overloading the electrical grid in the state.[5]    While electricity produced by fossil fuels, including natural gas, is still needed, regulators are considering when, not if, California will be able to phase out those energy sources.

34.    Other states are also turning to solar energy.    The same PRI report notes that in May 2017, Tucson Electric Power, a utility company in Arizona, agreed to buy solar energy to power 21,000 homes, including storage.    Solar energy has expanded throughout the United

---

[5]  https://www.pri.org/stories/2017-07-20/california-s-electrical-grid-can-t-handle-all-solar-energy-state-producing.

States, with California, Texas, New York, New Jersey, and Massachusetts having some of the largest cumulative solar capacity in the country.[6]

35.    Solar energy is being generated not just on roofs but also in power plants.  The Solar Energy Industries Association ("SEIA") released a report on September 11, 2017, outlining the state of solar energy in the second quarter of 2017.  In that report, the SEIA noted that utility-scale solar energy installations made up 58% of the total solar energy installations in second quarter of 2017.[7]  In 2016, 72% of the installed solar energy capacity was utility-scale, meaning that almost three-quarters of all solar energy installations in 2016 were considered power plants.[8] It is unclear what the short-term impact would be, but increasing its solar energy portfolio could increase the value of the Company in the long-term.  As with solar energy, wind energy has experienced exponential growth over the last 16 years, with capacity growing from over 4,000



Note: Utility-scale wind capacity includes installations of wind turbines larger than 100-kW for the purpose of the AWEA U.S. Wind Industry Quarterly Market Reports. Annual capacity additions and cumulative capacity may not always add up due to decommissioned and repowered wind capacity. Wind capacity data for each year is continuously updated as information changes.

---

[6]  https://www.seia.org/solar-industry-data.

[7]  https://www.seia.org/research-resources/solar-market-insight-report-2017-q3.

[8]  https://www.seia.org/solar-industry-data.

megawatts in 2001 to more than 84,400 megawatts in 2017[9].  Texas, one of the states where Calpine operates, leads the United States in wind energy capacity, with California not far behind.[10]

36.    Solar and wind are just two areas of energy experiencing continued growth, offering tremendous opportunities for Calpine.  However, the Company does not even need to diversify to create long-term value.  An article published with SeekingAlpha on October 14, 2015, entitled "Calpine Corp: Activist Management, Eco-Friendly And Significantly Undervalued," noted that the Company's natural-gas power plants placed the Company in "a favorable long-term position."  Calpine's cleaner plants mean that it "stands to benefit considerably" as global environmental standards become stricter.  "The continued shift away from coal and toward natural gas stands to solidify and augment not only the demand for Calpine's power but its position politically and from a public relations perspective[,]" according to the article.

37.    Morningstar, Inc., an investment research firm, called Calpine one of its "five-star" stocks according to a MarketWatch article from May 1, 2017, entitled "These are the only 9 stocks Morningstar is fully bullish on."  Five-star stocks are those where "appreciation beyond a fair risk-adjusted return is highly likely over a multiyear time frame."  That is, despite a lower stock price at that moment, Morningstar focused on the value of the Company over the long-term.

38.    Despite the glowing praise for the Company's long-term value, the Board opted to focus on the short-term gains of a sale that "increased" Calpine's stock price.  In a

---

[9]  http://awea.files.cms-plus.com/FileDownloads/pdfs/2Q%202017%20AWEA%20Market%20Report%20Public%20Version.pdf.

[10]  http://awea.files.cms-plus.com/FileDownloads/pdfs/2Q%202017%20AWEA%20Market%20Report%20Public%20Version.pdf.

communication sent to Calpine's employees on August 18, 2017, the Company stated that the Board approved the Proposed Transaction because "it believes the public equity markets undervalued our business and underappreciated our stable cash flows and strong track record of executing on financial commitments."

39.    In describing the Board's considerations for voting for the Proposed Transaction, the Proxy repeatedly notes the various factors impacting the Company's stock price:

***Prospects of Calpine***

- The current public market for shares of Calpine common stock, including that uncertainty about regulatory and energy market dynamics affecting the independent power producer industry had caused traditional investors in the sector to lose confidence in the potential for growth, which resulted in lower valuation multiples for independent power producers, including Calpine, and that the limited number of publicly traded companies in the industry and the decline in the total investible market capitalization of companies in the sector were impediments to traditional long-term investors continuing to invest in the industry, ***all of which negatively affected the price of shares of Calpine common stock, as did energy market prices generally***.

- Calpine's current and historical business, financial condition, results of operations, competitive position, strategic options, capital requirements and prospects, the nature of the industry and regulatory environment in which Calpine competes, including that the commodities sector generally and U.S. energy (power) market, in particular the independent power producer industry, continue to face a challenging environment, and Calpine's financial plan and prospects if Calpine were to remain a stand-alone publicly-held entity, ***and the potential impact of those factors on the trading price of shares of Calpine common stock (which cannot be quantified numerically)***.

- The prospective risks associated with Calpine continuing as a stand-alone publicly-held entity, including the risks and uncertainties with respect to (a) achieving its growth, operating cash flow and profitability targets in light of the current and foreseeable market conditions, including the risks and uncertainties in the United States and the global economy generally and the power industry specifically, (b) ***general market conditions and volatility, including the performance of broad-based stock market indices and exchanges*** and (c) risks and uncertainties described in the "risk factors" set forth in Calpine's Form 10-K for the fiscal year ended December 31, 2016.

- The inherent uncertainty of attaining management's internal financial projections, including those set forth in the section entitled "—*Certain Company Projections*" beginning on page [●] of this proxy statement, and the fact that Calpine's actual financial results in future periods could differ materially and adversely from the projected results.

40.     Instead of diversifying its portfolio to include more renewable energy sources, or even staying the course, the Board chose to cater to the demands of investors seeking solely to profit.

41.     The Board's myopic focus on stock price infected the process for considering a sale of Calpine.  Despite the Company's prospects and the value in continuing as a standalone entity, the Board rushed into an agreement with ECP.

42.     The focus on Calpine's stock price can be seen in Board discussions early in the process.  For example, in February 2017, the Board met and evaluated possible strategic alternatives for Calpine.  This had been an ongoing discussion over the previous year or so, but this meeting focused on a sale of the Company to a financial suitor.  A main consideration in the discussion was Calpine's low stock price.  The Board met on May 9, 2017, to discuss proposals to acquire the Company, as submitted by ECP and a Party A.  Again, the Board discussed Calpine's low stock price in connection with the discussion about a potential sale of the Company.  Soon after, the Company entered into an exclusivity agreement with ECP.

43.     Once the Board received a proposal that apparently met its criteria for price per share, the Board favored that proposal at the expense of other potential acquirers.  Consider that at a meeting in March 2017, the Board was presented with a list of 25 possible financial sponsors and four strategic acquirers.  The Board opted to contact only a limited number of financial sponsors.  Seven financial sponsors were then contacted by the Company's financial advisor, Lazard.  Of those, four entered into confidentiality agreements with Calpine and two submitted an indication of interest.  There is no indication that the other 18 possible sponsors or acquirers were ever contacted, including during the Go-Shop period.

44.    In early May 2017, articles came out discussing a potential acquisition of the Company.  After that, 14 more parties, including financial sponsors and strategic acquirers, indicated interest in acquitting Calpine.  There is no indication that these parties were contacted during the Go-Shop period.  When Defendant Hill disclosed in a press release on July 28, 2017, that the Company was considering strategic alternatives, more inquiries were received.  And again, there is no indication that the parties making those inquiries were contacted during the Go-Shop period.  Calpine favored ECP throughout the sales process and did not make a serious attempt to find a different acquirer.

45.    The tipped scale in favor of ECP is also evident in the terms of the Merger Agreement itself.  While ECP agreed to a go-shop period after entering into the Merger Agreement, there were conditions placed on the Company that benefitted ECP.  Section 8.4(a) prohibits Calpine from discussing a transaction with an entity identified by ECP as a Sponsor Investor.  Section 8.4(g) requires Calpine to inform ECP of the number of alternative proposals received and the identity of the entity making the proposal, as well as the identity of each entity or group who reached out to Calpine about a potential alternative transaction.  In addition, section 8.4(g) requires Calpine to provide ECP with the terms of any alternative transaction and keep ECP apprised of the status of discussions or negotiations.  These provisions make it unlikely that another proposal will emerge.

**B.    Calpine's Officers Stand to Receive Benefits Unavailable to the Class**

46.    The Proxy acknowledges that the Company's executive officers have interests in the merger that may differ from those of the stockholders and may create conflicts of interest.

47.    Stock options, restricted shares, restricted stock units, and performance stock units awarded to and held by Calpine's executive officers and directors will vest and be

converted into the right to receive either the Merger Consideration or another amount. The treatment of these equity awards, in addition to benefits provided to executive officers through Calpine's Amended and Restated Change in Control and Severance Benefits Plan and the employment agreement with Defendant Hill, will create a windfall for Calpine's executive officers that is unavailable to the common stockholders. As demonstrated in the following chart, Defendant Hill will receive more than $18.6 million, and the named executive officers of Calpine in total stand to receive up to $46 million, if they are let go without "cause" or voluntarily leave for "good reason:"

| | Cash Severance | Unvested Equity | Perquisites/ Benefits | Other | Total |
|---|---|---|---|---|---|
| John B. (Thad) Hill III | $8,854,800 | $9,644,746 | $146,872 | — | $18,646,418 |
| Zamir Rauf | $4,212,503 | $3,452,662 | $141,872 | — | $7,807,037 |
| W. Thaddeus Miller | $5,750,068 | $2,157,222 | $113,828 | — | $8,021,118 |
| W.G. (Trey) Griggs III | $3,457,081 | $2,866,813 | $141,872 | — | 6,465,766 |
| Charles M. Gates | $3,102,942 | $1,926,168 | $113,828 | — | $5,142,938 |

48.    The members of the Board and the executive officers stand to gain handsomely from the Proposed Transaction, no matter whether they stay or leave. In total, as demonstrated in the following chart, the executive officers and Board members will obtain more than $24.3 million:

| | Name | Total Option Consideration | Total Restricted Share Consideration | Total Restricted Stock Unit Consideration | Total Restricted Stock Consideration |
|---|---|---|---|---|---|
| **Non-Employee Directors** | | — | — | $1,090,146 | — |
| **Executive Officers:** | John B. (Thad) Hill III | $ 1,085,638 | $1,936,338 | $1,809,153 | $4,813,617 |
| | Zamir Rauf | $ 384,484 | $660,508 | $668,026 | $1,739,644 |
| | W. Thaddeus Miller | $ 523,306 | — | $909,236 | $724,680 |
| | W.G. (Trey) Griggs III | $ 315,533 | $550,388 | $548,238 | $1,452,654 |
| | Charles M. Gates | $ 283,209 | $303,475 | $492,072 | $847,412 |

| | | | |
|---|---|---|---|
| Other Executive | | $644,374 | |
| Officers (3 | $ 279,855 | | $1,094,035    $1,152,336 |
| people) | | | |

## C.    The Materially Incomplete and Misleading Proxy

49.    The Individual Defendants owe the stockholders a duty of candor.  They must disclose all material information regarding the Proposed Transaction to Calpine stockholders so that they can make a fully informed decision whether to vote in favor of the Proposed Transaction.

50.    On October 19, 2017, Defendants filed the Proxy with the SEC.  The purpose of the Proxy is, inter alia, to provide the Company's stockholders with all material information necessary for them to make an informed decision on whether or not to vote their shares in favor of the Acquisition.  However, significant and material facts were not provided to Plaintiff and the Class.  Without such information, Calpine shareholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

### Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts

51.    The Proxy discloses management-prepared financial projections for the Company which are materially misleading.  The Proxy indicates that in connection with the rendering of Lazard's fairness opinion, Lazard reviewed "various financial forecasts and other data provided to Lazard by Calpine relating to the business of Calpine."  Accordingly, the Proxy should have, but failed to, provide certain information in the projections that Calpine's management provided to the Board and Lazard.

52.    Notably, Defendants failed to disclose in the projections the change in net working capital; and a table reconciling the non-GAAP measures to the most comparable GAAP

measures.  This omitted information is necessary for Calpine stockholders to make an informed decision on whether to vote in favor of the Proposed Transaction.

***Materially Incomplete and Misleading Disclosures Concerning Lazard's Financial Analyses***

53.    First, with respect to the *Selected Public Company Analysis*, the Proxy fails to disclose the objective selection criteria and observed assumptions, multiples and financial metrics for each company.  The Proxy also fails to disclose the estimates provided by Wolfe Research for the EBITDA estimates for Calpine and each company used in the analysis, including NOL-adjusted Enterprise Value to 2017E EBITDA and NOL-adjusted Enterprise Value to 2018E EBITDA.  In addition, the Proxy omits the relevant metrics for Calpine and the other companies used to apply a NOL-adjusted enterprise value to EBITDA multiple range of 7.00x to 8.00x and 6.50x and 7.50x to the calendar years 2017 and 2018 estimated adjusted EBITDA for Calpine, respectively.  The Proxy also fails to disclose the inputs and assumptions used by Lazard to derive the discount rate range of 6.00% to 12.25%.

54.    Second, with respect to Lazard's *Discounted Cash Flow Analysis,* the Proxy fails to disclose the individual inputs and assumptions used by Lazard to derive the discount rate ranges of 5.75% to 6.25% for unlevered cash flows, 11.75% to 12.75% for levered cash flows and 6.00% to 12.25% for NOL utilization.  The Proxy also fails to disclose the individual inputs and assumptions used by Lazard to derive multiples ranging from 6.75x to 7.75x in calculating the terminal value of Calpine.

55.    With respect to Lazard's *Selected Precedent Transactions Multiple Analysis,* the Proxy fails to disclose various material elements of the analysis.  For example, the Proxy does not disclose the observed multiples for each of the selected companies analyzed by Lazard, as well as any benchmarking analyses Lazard performed for Calpine.

56.    Lastly, the Proxy fails to disclose the change in net working capital and the perpetuity growth rate for Calpine.

***Materially Incomplete and Misleading Disclosures Concerning Conflicts of Interest***

57.    The Proxy also fails to disclose material information concerning conflicts of interest.  For example, there is no mention of any work done in the past two years by Lazard on behalf of Calpine, ECP, Access Industries, Inc. or the Canada Pension Plan Investment Board. The Proxy notes that Lazard was retained because or, among other things, its familiarity with Calpine's business, and further notes that at its meeting on August 16, 2017, the Board "discussed certain relationships with Lazard and various participants in the strategic alternatives review process of which the Calpine Board was previously made aware prior to this meeting and the May 9, 2017 meeting of the Calpine Board and determined that such relationships were not material to the Calpine Board's evaluation of strategic alternatives."  Any relationships between these entities and Lazard, including the nature of the work done, the timing of the work and compensation earned, is material information that stockholders need in order to consider whether a conflict of interest exists.

58.    In addition to conflicts of interest pertaining to Lazard, the Proxy fails to disclose information concerning potential conflicts of interest pertaining to employees of Calpine.  At a meeting of the Board on May 31, 2017, the Board and the Company's legal representatives, White & Case LLP, discussed "certain existing and prior relationships of employees of Calpine . . . with Party A, [ECP] and Potential Equity Financing Party."  There is no other information concerning which employees had these existing or prior relationships, the nature of those relationships and whether the Board determined to act in any way as a result of this discussion. At the same meeting, the Board discussed current and prior relationships between White & Case

LLP and ECP, Party A and Potential Equity Financing Party.  Similarly, the Proxy is silent as to the nature of the relationships and whether the Board acted as a result of the discussion.

***Materially Incomplete and Misleading Disclosures Concerning the Flawed Process***

59.    The Proxy also fails to disclose material information concerning the sales process.

60.    For example, the Proxy fails to disclose the members of Calpine's senior management that attended meetings of the Board on February 14-15, 2017, March 24, 2017, May 9, 2017, May 31, 2017, June 29, 2017, July 10, 2017, July 28, 2017, August 9, 2017, and August 16-17, 2017.  Similarly, the Proxy fails to disclose the members of Calpine's senior management that attended meetings of the Transaction Committee on July 15, 2017, July 22, 2017, August 7, 2017, and August 9, 2017.

61.    The Proxy also fails to disclose whether the Company contacted Party D, Access, the 18 parties suggested by Lazard in March 2017 but not contacted at that time, or any of the other parties who inquired about a potential transaction with Calpine after May 2017, during the go-shop period.

62.    This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders will not be fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

63.    Without all material information, Calpine stockholders are unable to make a fully informed decision in connection with the Proposed Acquisition and face irreparable harm, warranting the injunctive relief sought herein.

64.    In addition, the Individual Defendants knew or recklessly disregarded that the Proxy omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

65.     Specifically, the Individual Defendants undoubtedly reviewed the contents of the Proxy before it was filed with the SEC.  Indeed, as directors of the Company, they were required to do so.  The Individual Defendants thus knew or recklessly disregarded that the Proxy omits the material information referenced above and contains the incomplete and misleading information referenced above.

66.     Further, the Proxy indicates that on August 16 and 17, 2017, Lazard reviewed with the Board its financial analysis of the Merger Consideration and on August 17, 2017, delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion dated August 17, 2017, to the effect that the Merger Consideration was fair, from a financial point of view, to Calpine shareholders.  Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning Lazard's financial analyses which has been omitted from the Proxy, and thus knew or should have known that such information has been omitted.

67.     Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law.  Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**CLAIMS FOR RELIEF**

**COUNT I**

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9**

68.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

69.    Defendants have filed the Proxy with the SEC with the intention of soliciting Calpine shareholder support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

70.    In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Calpine, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

71.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

72.    Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) management's financial projections; and (ii) the value of Calpine shares and the financial analyses performed by Lazard in support of its fairness opinion.

73.    Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Lazard reviewed and

discussed its financial analyses with the Board during various meetings including on August 16 and 17, 2017, and further states that the Board relied upon Lazard's financial analyses and fairness opinion in connection with approving the Proposed Transaction.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

74.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

75.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

76.    The Individual Defendants acted as controlling persons of Calpine within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Calpine and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

77.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy.

79.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

80.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

81.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons,

these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

82.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

<strong>RELIEF REQUESTED</strong>

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against Defendants, jointly and severally, as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Preliminarily and permanently enjoining Defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from filing a Definitive Proxy with the SEC or otherwise disseminating a Definitive Proxy to Calpine shareholders unless and until Defendants agree to include the material information identified above in the Definitive Proxy;

C.    Preliminarily and permanently enjoining Defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

D.    In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

E.    Directing Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  October 31, 2017.

                                        Respectfully submitted,


                                        _____*/s/ Thomas E. Bilek*_____
                                        Thomas E. Bilek
                                        TX Bar No. 02313525 / SDTX Bar No. 9338
                                        **THE BILEK LAW FIRM, L.L.P.**
                                        700 Louisiana, Suite 3950
                                        Houston, TX  77002
                                        (713) 227-7720

                                        *Attorneys for Plaintiff*

**OF COUNSEL:**

Shane T. Rowley
Danielle Rowland Lindahl
**ROWLEY LAW PLLC**
50 Main Street, Suite 1000
White Plains, NY  10606
Tel: (914) 400-1920
Fax: (914) 301-3514